Case number 223376, Emco, et al. v. Miller Transfer and Rigging Company. Argument not to exceed 15 minutes per side. Mr. Williams, you may proceed for the appellants. Thank you. Good morning, your honors. May it please the court, Nathan Williams for plaintiff's appellants, Emco Mayor, GMBH, Emco Corporation, and their segregated underwriters, Generali. I've requested for four minutes be set aside for rebuttal, if I may. Thank you. Emco hired Miller to perform a service, namely the packaging of its cargo in seaworthy manner, which is to say a manner sufficient to survive the environmental conditions it would encounter en route to its final destination, Austria. If seaworthy is important at the outset, why didn't the bill of lading take you all the way to Austria? Well because the shipment was structured in a way that Miller was only hired to deliver within the United States. Miller doesn't operate internationally for the shipment. So the shipment was terminated for the purposes of the movement of the cargo when it was tendered to Miller up into the point of the Port of Baltimore. However, then at that point, it needed to be transferred. But if you desired to do the whole thing at once, presumably there was someone out there that would do the whole thing, right? Yeah, they could have chosen a different company that provides that full multimodal transit from point A to point B, but they didn't and they're under no obligation to have done so. No, I couldn't agree more. They're only under the obligation of dealing with the consequences of the choice. Well, let's look at the consequences of the choice. They asked Miller to perform two functions. One, move cargo from point A to point B. That clearly falls under the Carmack Amendment. That's the transportation obligation. They also asked Miller to package the cargo, which also falls under Carmack. Carmack Amendment broadly defines transportation to include not only the movement of property, but services incidental to the movement of property, expressly including the packing of cargo. This is a Carmack claim. The question is, did Miller abide his obligations with respect to packaging the cargo? The packaging of the cargo occurred in the United States. The jurisdiction of the Carmack Amendment extends to shipments in the United States to a foreign country to the extent that transportation occurs in the United States. That's what happened here. The transportation, namely the packaging of the cargo, occurred in the United States. The seeds of the damage, the seeds of the breach of contract, they were sown in the United States. It shouldn't matter that the damage wasn't discovered until the intended destination. What's the best authority for the seeds of the claim? What's the best authority that that's the law under Carmack Amendment? The first issue is, if you look at INTEC, INTEC basically relies on a Supreme Court precedent from 1916, establishes that it's the intention of the parties that governs delivery, final delivery, for the test of whether or not the second prong of the Carmack crime of fascia case... Okay, but I don't see that as referring to the seeds of the claim or whatever that... Well... I don't mean to mischaracterize what... Seeds of what? Seeds of the destruction were sown in the United States. Seeds of the destruction? Were sown in the United States. Okay. Where does that come from? I mean, I know it's in your brief, but what authority do you take that from? The Carmack Amendment, quote, under the Carmack Amendment, quote, a carrier's liability... Let me start that over. Do you have any authority? Yeah, I'm going to read it to you right now. I know what the Carmack Amendment says. A carrier's liability under the Carmack Amendment includes all reasonably foreseeable damages resulting from the breach of a contract. That's National Hispanic Circus, V-Rex Trucking, 414 F3rd, 546 at 549. So if the intention of the parties is to package this cargo in a manner sufficient to get it all the way to Austria, and a carrier can be held liable for all reasonably foreseeable damages caused by a breach of contract, it's reasonably foreseeable that if they insufficiently package this cargo in the United States, that's not going to be discovered until it arrives in the foreign destination, which is the agreed final destination under the packaging obligation that Miller assumed when it entered into this contract in the first place. Yeah. So the basic argument is that Miller should have known to include this vacuum foil bag packaging or whatever it might be, because there's some indication in the record that that was declined. That's absolutely true. It was declined by Ms. Riordan at EMCO. That's true. And so is the argument that still for a C worthy bill of lading or contract that Miller should have known that, oh, even though she says EMCO doesn't want it, we still should have included it? No. So Ms. Riordan declined the vacuum sealed bag. But what EMCO did contract for was for the use of a VCI system. VCI is vapor corrosion inhibitor. It's a specialized film that is designed to mitigate against the risk of damage through atmospheric moisture. In order to use this type of film, you wrap cargo tightly so it has very confined space and you insert desiccants into that system. And the desiccants absorb whatever atmospheric moisture is within that confined space. And then therefore you mitigate from it. So this vacuum foil bag is not? Vacuum foil bag is one of two options that could have provided C worthy packaging. They didn't pay for it. They didn't opt for that option. It was presented as an option, even though Clary and the subcontracted manufacturer of the packaging stated to Miller that this absolutely should have been done. That recommendation was not passed on to EMCO, which we suggest is negligence under the circumstances. But the option that they did accept and they did pay for is a proper VCI system. If you've got a proper VCI system, as the argument goes, you wouldn't need this foil bag. Absolutely not. So the foil bag, what Miller is going to argue is the foil bag equals C worthy packaging. They declined the foil bag, therefore they declined the need for us to provide C worthy packaging. That's not the case. We paid for a VCI system, it's specified in the quotes. They did not use the proper method and that's explained in our expert's report. We asked their own expert on a scale of 1 to 100 what kind of protection was provided under the circumstances. And he said low single digits. So to say that this was insufficient packaging is an understatement. So ultimately what this comes down to is whether or not we satisfy the second prong of the prime facie case. Where is delivery? Delivery is defined by the intent of the parties. It's a federal law question and INTEC explains basically that you have to look at all the facts and circumstances in order to inform the intent. And here the district court actually found what the intent of the parties was expressly in on page record page ID 2473. Basically found that the cargo was going to be tendered to Miller for C worthy packaging. It was going to be transferred from Dover to Ohio, from Dover, Ohio to Searcy's Marine Terminal in Baltimore. At the port of Baltimore it would be handed over to Miller, from Miller to Rotra, an agent, loaded on EMCO's nominated vessel, taken to the port of Bremerhaven, Germany and discharged to EMCO's nominated carrier to transport to Helene, Austria. So the intention of the party is clear. If I hire you to package cargo to get all the way to a final destination and there is no intent to open the package mid-transit because that would render useless the entire packaging operation in the first place, the test of whether or not you've abided your obligations to sufficiently package the cargo can only be tested at destination. And the breach occurred here in the United States, therefore subject to the Carmack Amendment. And the breach is valued to be omissions of Miller's own experts, pretty clear and obvious from the failure to properly use the VCI system that was applied under the circumstances. They lined this container with VCI, stapled it in place, threw in some desiccants that you would use, the type you would use for a cell phone, and threw them across the floor. According to our calculations by our experts, in the one larger- How does insurance work for this? I would think insurance companies would be a little stressed out by this possibility of both, do we insure the leg from Michigan to Baltimore, and if we're going to insure the leg from Baltimore to Austria, don't we want to make it clear who the responsible party is? And the way this is working out under your theory, you've got two potentially responsible parties, right? The people that do delivery from Baltimore to Austria, plus the people that package from Michigan to Baltimore. Am I getting it right? You're not, Your Honor. First of all, with respect to the insurance, usually a broad cargo insurance policy, such as those that exist in the market, provide cargo insurance from the warehouse door to final destination. So that's pretty pro forma in the industry. Secondarily, we're not alleging responsibility on behalf of the COGSA carrier that carried the cargo to destination. The damage was caused solely because this cargo was not properly packaged. This cargo was shipped in the late months of 2017 across the Atlantic, where Miller knew and understood that it was going to face all the environmental conditions that are normally encountered during that process, wind, rain, moisture fluctuations, temperature fluctuations, which can cause condensation, which probably caused the condensation in this action. It's the fact that they knew that this was ultimately going to Austria, which they and it, that establishes that the intent of the parties with respect to packaging was that the package would survive. In the words of Intex, something was left to be done after that delivery at the port of Baltimore. What was left to be done was the packaging had to sufficiently protect the cargo all the way to destination. So what about the argument that once it got to Austria, it sat out in the elements for 40 days or something like that? First of all, that's false. So we produced pictures and the metadata within the pictures, which was produced late, mind you, because of a technical error within our office, shows that it was inspected on two days after delivery. It was delivered on the 21st and it was inspected on the 20th. Those photos were taken on the 23rd. Alexander Robb testified, he is the receiver at EMCO Austria. He testified that the photos, during his deposition, he looked at the photos and he said those were taken after delivery, right after delivery when the cargo was placed in our receiving yard. Mr. Williams, I asked you earlier about your best authority and all you did was you just read the statute. I mean, do you have a case? I didn't read the statute, Your Honor. I read... Whatever. Do you have a case with similar facts to this that we can look at that establishes some precedent in your theory? No. The cases do not... The cases talk about delivery in an abstract. Usually delivery is whether or not you set a container outside of a yard and failed to provide proper notice, or you set it out or it was rejected, it was returned to someone. So there's not a perfectly analogous case. But in INTEC, the language of INTEC provides the guidance this court needs. So we don't have a case. Okay. Is it your theory that the shipment from Baltimore to Austria is governed by the Carmack Amendment and not the Carriage Goods of Sea Act, or is it governed by both acts? No, no. So Carmack... The Carmack Amendment, because this transportation, the physical movement of the transportation, that is the transportation aspect of this agreement, that ends at the Port of Baltimore. There is no through bill of lading issued. So at that point, the ocean carrier... Okay. But the Carmack Amendment terminates upon delivery, right? So you say that there was no delivery in Baltimore because the ultimate delivery was in Austria? There's two delivery points that need to be appreciated, because there are two obligations. The first is a transportation obligation.  There's a secondary obligation. There's an additional aspect of this contract, and that is that it's going to be packaged. It's going to be packaged in a manner that is sufficient to reach all the way to Austria. And so therefore, final delivery cannot occur for that second aspect of the contract until it arrives in Austria. I understand the Carmack Amendment applies only to interstate commerce? So the jurisdiction of the Transportation Safety Board is established by... Well, okay. That's not correct. It's not correct. The Carmack Amendment governs whenever there is a shipment, quote, between a place in the United States and a place in a foreign country to the extent the transportation is in the United States. So the transportation, under that broad definition provided by the Carmack Amendment, which applies not only to the movement of property, but also the packaging of property, that packaging occurred in the United States. So the Carmack Amendment has the transportation purposes ends in Baltimore, but you say the Carmack Amendment for purposes of packaging extends to the overseas transport that normally is governed by the Overseas Act. Is that it? Cogsail. Part of the carriage of goods that... The Cogsail applies from ports... Isn't it odd there's no case that has so held? No, I don't think so. It seems like this would happen before. It's not that common, actually, Your Honor. Usually packaging is done in-house because the parties know the needs of their own cargo. So it's not all that common that this type of subcontracting, especially for this large type of cargo. I think Miller's representative testified that less than five out of 500 instances per annum for them, and they represent a number of different companies across a broad spectrum of transportation needs. So I don't think it's uncommon, and I certainly don't think that the case law doesn't give the court... We're going to give you your full rebuttal. Okay. Thank you, Your Honor. Thank you. You're from the other side. Good morning. Good morning. May it please the court. My name is Dina Stein. I'm an attorney with the law firm Benesch, Friedlander, Copeland, and Aronoff for appellee defendant Miller Transfer and Rigging. It's undisputed black-letter law. Carrier's CARMAC liability terminates upon delivery to the consignee and is not liable for any damages incurred after delivery. NTEC Inc. be consolidated freightways. The 1987 First Circuit case AMCO's entire appeal is premised on expressly holds. The liability of a carrier for damages to could shipped through interstate commerce extinguishes upon delivery. He says that only applies to transportation liability and not packaging liability. Is that true or not? I have found no case dealing with this exact issue of transportation, the definition being used with respect to the packaging, where the packaging occurs in the United States and the damage occurs overseas. You would have asked earlier about an authority. I am unaware of such authority. I'm unaware of any authority where a CARMAC claim is extended just generally, whether it's transportation or packaging, where the damage occurs overseas and the court has held that CARMAC applies to the domestic carrier. Generally speaking, having a through bill of lading would have solved this problem. Having a through bill of lading. If you had a through bill of lading, then the International Carriage of Goods Act would apply, right? Correct. Okay. I wanted to address a few of the things that AMCO addressed. With respect to the seaworthy packaging, the vacuum sealed foil bag option, and again, this is not actually on appeal, but the vacuum sealed foil bag option, that was the seaworthy packaging option. It was declined. It wasn't paid for. A quote was given to AMCO. AMCO accepted a quote and the quote didn't have that line item. A line item, it was about $1,000, was presented to AMCO earlier. AMCO declined that. I'm aware of any legal authority that said Miller had to give them the seaworthy packaging that they clearly didn't pay for and that they clearly didn't want. What then is the VCI option and the desiccants, the anti-drying? I believe that's just going to be standard. Standard shipping. That there was an option for seaworthy packaging. It was declined. I believe that Miller or Clarion, who was the entity that actually did the packaging, my understanding is that that would have just been standard. Standard as in that's what you always do? Correct. Correct. But there was a seaworthy... Is it an extra charge? I believe that was included in the quote that was accepted. But the seaworthy packaging, it was a vacuum sealed foil bag that would have basically been waterproof. That was another $1,000 and they declined it for whatever reason. With respect to AMCO's argument about the seeds of damage, the seeds of damage being sown, I'm aware of no authority for that premise. In fact, in its decision, the district court made note of that and said it was also unaware of any authority. And Intec has nothing to do with the seeds of damage argument. What Intec says is that it's not delivery if something remains to be done by the carrier in order to effectuate delivery. So what happened in... This is supposed to work in the industry. If you don't have a through bill of lading and you're a nervous person about what could go wrong, you're supposed to, in Baltimore, open the thing up and make sure everything is just A-OK before you do the next shipment? Is that the way the Carmack Amendment thinks about this? Well, a couple things. Again, that through bill of lading would have eliminated this entire problem. I got it. But for whatever reason, they don't do it that way. And so now the way this works is you... Yeah, you're going to have to open the whole thing up and it's on you to make sure nothing happened. There's no seeds of anything. Is that how it would work going forward if you win? I don't agree that's how it would have to happen. Again, I think the alternative is, at the beginning of the shipment, you have to have that through bill of lading. This is an international shipment at its core. And the Carmack Amendment has its limitation to interstate commerce. If this is an international shipment, you intend it to be an international shipment, that's what that through bill of lading is going to be for, so that COGSA will apply and a remedy will be available for the shipper, whether the damage occurs at Baltimore, which didn't happen here, whether it occurs in the middle of the ocean, whether it occurs on land. There were inland carriers, too. So, you know, another issue here is that EMCO didn't effectively select the seaworthy packaging option. So EMCO is not just stuck between a rock and a hard place. There are things EMCO could have done. Additionally, on the other end of the carriage... No, it could have opted for the foil bag, vacuum sealed option, first of all. And it could have said, we need a through bill of lading, understanding the limitations of COGSA, if this cargo is damaged internationally. There's no question that it wasn't damaged at Baltimore, so to your point about opening the cargo up, I'm not sure that would have made a difference here. But nonetheless, there's no allegation that the cargo was damaged at the Port of Baltimore. With respect to INTEC, again, the court said it's not final delivery if anything remains to be done by the carrier in order to effectuate a delivery. In that case, it was, first of all, not an international shipment. It was a delivery, I believe, California to Massachusetts. But importantly in INTEC, there was a bill of lading and there was a handwritten notation on that bill of lading stating, per Mrs. Dowling with C-slash, and the dispute arose over whether that carrier had an obligation to unload the cargo. But again, the court held, the liability of a carrier for damages to good ship through interstate commerce extinguishes upon delivery. Delivery is a question of federal law. The court made that holding of delivery not being final if there's something left to be done, because in that instance, the issue was, the carrier had an obligation to unload the cargo. That was the discrete task that was left for the carrier to do in order to effectuate delivery. Here, EMCO's trying to contort that holding to fit these facts. This is from EMCO's appellate brief. What was left for Miller to do was for the packing it applied to remain sufficient for the cargo to have survived its subsequent journey from Baltimore to Helene, Austria. That argument, it makes no sense. It's grammatically incorrect. It's logically incoherent. There's no discrete task such as unloading a cargo. Here, the packing of the cargo, it was completed in the U.S. It was completed before Baltimore. I believe the packing was complete in Ohio. And there's no reference to any packing obligations on the Bill of Lading. Unlike INTEC, there's no ambiguity needing resolution. So EMCO's discussion of the intent of the parties, that this cargo was always going overseas, intent of the parties with respect to packaging, that's not on the Bill of Lading. And EMCO cites no case, and I have found no case, that says you can just disregard a clean Bill of Lading and insert parole evidence of the party's intent to put on some other obligation on the carrier. EMCO's claiming in its brief that Miller's reading of INTEC is too literal, but that's literally the only way it can be read. Taking EMCO's argument to its natural conclusion, we wouldn't know whether delivery is final and the cargo is actually delivered until that subsequent task is known to have been done adequately. That's squarely against what CARMAC holds, which is that the carrier's liability is extinguished upon delivery. With respect to the second prong, which is that if this court determines that Austria was the point of delivery and not Baltimore, EMCO's claim is that it's entitled to summary judgment as a matter of law because it meets the elements of CARMAC. That is not true. EMCO still has to show that the cargo arrived damaged. That is absolutely lacking here. The evidence that EMCO submitted on summary judgment for the first time was this metadata of a photo purporting to show that the cargo was open shortly after delivery and that there was a time stamp showing that it was open and that there was damage. That very evidence is the subject of an undecided motion to strike. Metadata is not self-authenticating. That was a main point on the motion to strike. EMCO's main witness, Mr. Rab, actually submitted an unsigned declaration purporting to authenticate that metadata and purporting to claim that the cargo was in fact open shortly after delivery. EMCO later submitted a signed declaration from that witness and it didn't do any of those things. So EMCO's claim that the witness stated, oh, the cargo was open, the deposition testimony is actually chock full of I thinks and I don't knows and it's not clear and that was why Miller brought this motion to strike because the evidence showing that the cargo arrived damaged was questionable. It is unclear that the cargo arrived damaged. What is clear is that the cargo sat outside EMCO Austria's facility for over 40 days during the cold, wet, rainy Austrian winter. If the cargo was opened at delivery, it was opened and exposed and then sat out there for 40 more days. I believe it rained at least half of those days and continued to get wet. EMCO's experts didn't look at this cargo and take its pictures and inspect the cargo until after that time. In fact, EMCO's experts came back and said, I think you should put a tarp over this thing. So to the extent we're looking at Austria as the point of delivery, EMCO cannot prove as a matter of law, certainly not at this point, that the cargo arrived damaged and even the amount of damages. There was no mitigation of damages here. Counsel, because of all that, would mediation be any assistance at this point in the case? I think I saw on the docket that this was referred to the mediation office earlier on and it was unsuccessful but at this point do you think it would be helpful at all? Probably not. My recollection is that this case was actually mediated twice. I believe my colleague handled the first mediation probably before summary judgment and then we had the pre-appellate argument mediation which was not successful. Before my time is up, I just want to hit a couple more points. You don't have to hit all of them. One thing that EMCO talked about in arguments was that it just makes no sense basically for Baltimore to be the point of delivery given that this was an overseas shipment because the whole point of seaworthy packaging, and I don't disagree the whole point of seaworthy packaging, is that for the cargo to make it all the way overseas intact. But that is the result that we are stuck with under CARMAC. And I just want to remind this Court that on summary judgment, it was EMCO that argued that CARMAC applied. Miller took the position that there was a bill of lading, that it was a through bill of lading, a through transaction, and COGS applied. So this is unfortunately the result for EMCO under CARMAC. This is why, and I mentioned this before. CARMAC replaces the normal negligence standard. Correct. And it does also for packaging, right? Correct. So what this is is it's kind of a gap that CARMAC didn't think about, I guess, that the packaging, you know, if this was a normal negligent claim, the fact that the transportation ended in Baltimore would be one thing, but the negligence continued on through to Austria where it was discovered. But CARMAC has taken over the field, and by having more of a strict liability standard and everything else, but this might be an unintended consequence of CARMAC that, I mean, without CARMAC, they'd have a negligent claim, I think, because the negligence happened in the United States and it wasn't discovered until Austria, but because CARMAC is so, you know, specific about liabilities that, I mean, you're just saying it doesn't apply even though it might be unfair. I don't think that it's a gap, so to speak, because Well, they don't have a remedy here, do they? They would have had a remedy had they, well, first of all, had they done things differently, had they actually opted for the C-worthy packaging option. Okay, I'm afraid those are issues. I mean, saying it was, you know, they were negligent in packaging and it was delivered in Baltimore. I mean, they don't have a remedy here, right? Had there been a through bill of lading, there would have been a remedy under COGSA. However, that would have been time-barred by the time they brought that. Yeah, okay, so they would have had a remedy under COGSA. They just waited too long. Correct. So that's not, that's why I wouldn't agree that there's a gap in the statute. But again, cargo is very shipper-friendly. You only have to prove, as a shipper, you gave the cargo to the carrier in good condition. It arrives in damaged condition in the amount of damages. Under CARMAC, if this is purely interstate commerce, which again, this is interstate commerce from Ohio to Baltimore, and then it's international shipping all the way to Austria. But under CARMAC, you wouldn't have to open up the cargo and prove where the damage occurred. But that is just how things go when you're using an international shipment and that's why COGSA sort of gap fills. Does COGSA apply to packaging as well? I am not sure. But in this case, Miller also was a carrier in the traditional sense. Miller did move the cargo. So I believe that under COGSA, Miller would still be liable or at least would be brought into a lawsuit had it been brought timely. I know this is a CARMAC amendment case, but you're talking about what makes sense and what doesn't make sense. It does seem clear that Riordan was looking for a C-worthy package early on, the emails back and forth. So I guess we're to conclude that at some point, she decided that EMCO did not want a C-worthy package because she opted for a VCI, which apparently is standard, maybe standard and not C-worthy. So there was a business decision that was made. This may not be in the record, but in terms of common sense, she or someone made a business decision. We're not going to get this foil bag option. Does that make sense? I can't see why she would decline it, quite frankly. I can't speak for Ms. Riordan. I know you can't. For the folks at EMCO, somewhere along the line, the information was passed and she declined, whether it was a cost that they didn't want to pay. Again, my recollection is that line item was about $1,000, maybe business decision. I'm upset. Don't worry about it. That's too much money. We'll take our chances. I also understand that the cargo was, I believe the cargo was inside in the shipment, and the expert reports also showed no seawater. They found no evidence of that. It goes back to what could have been done. Well, they left this cargo out for 40 days. Maybe that's why it got wet, whether it was opened or not. But seaworthy, it did. It was seaworthy. If there was no seawater found in the cargo, then I think an argument can be made that it was, in fact, seaworthy. You've answered my question. Thank you. All right. Thanks very much. Thank you very much. Ms. Riordan overlooked that there was this option. She hired Miller because Miller was supposed to be an expert. They presented themselves to Ms. Riordan and to EMCO as the experts on this issue. They thought Miller was doing this. They had no idea Clarion was being subcontracted   It was just a matter of, there was no business decision. It wasn't cognizable. That's what her testimony is in her declaration and in her deposition. But it's still EMCO's omission, right? It's EMCO's omission. There's arguments they're relying on Miller and maybe Clarion. I'm not asking the court to hold Miller to anything we didn't agree to. We hired them to perform a service. I'd seaworthy cart packaging with the use of VCI, properly applied, and desiccants. That's written into the quote. That's what was paid for. We're not litigating this because they didn't provide a foil bag. But foil bag does not equal seaworthy packaging. In our experts' report, they explain that seaworthy packaging can be provided through two methods. You can use a vacuum-sealed bag because that removes all the atmospheric moisture and solves the problem. You can also use the proper application of VCI and desiccants, which was used here. That should have been seaworthy packaging. Miller knows that they were supposed to provide seaworthy packaging. They knew at all times that this cargo was going to Austria. And so you're absolutely right, Your Honor. What remedy do I have under the circumstances? A suggestion that I had to restructure the entire mode of transportation doesn't hold. I don't think that holds water. This is the United States of America. You can structure your transportation arrangements in any legal method possible. They did so here. The transportation leg was handled by Miller. That leg ends for the physical delivery purposes at the Port of Baltimore. They also entered into a secondary aspect in the agreement, and that was, I'm going to provide in the United States sufficient packaging for this cargo to get to Austria. They failed to do that. They breached their contract. The breach arose in the United States, that it wasn't discovered until it arrived in Austria, has no import whatsoever on the case. So the suggestion that there had to be a through bill of lading here or a through bill of lading would have solved all the problems is not accurate, one of which there's lots of issues with respect to cargo that I don't think it's really worth discussing. But we might not have been able, there's usually an exemption for subcontracted carriers within a broad movement, a multimodal movement from interior United States to interior foreign country. And so we wouldn't have had a remedy under COGSA anyway. But ultimately, what's important for the court to understand is CARMEC sets a low bar. And it sets a low bar because the purpose of the amendment is explained by the U.S. Supreme Court in Reader v. Thompson. It was to relieve shippers of the burden of searching out a particularly negligent carrier from among the often numerous carriers handling an interstate shipment of goods. So that's why all we have to show is that the cargo is tendered in good order, which we have, it's been admitted by Miller, and that it was delivered in damaged condition. It was delivered in Austria in damaged condition. The intention of the parties was always that this cargo would be sufficiently packaged to get to that destination. And that's all we're asking the court to hold. Otherwise, you're completely right, Judge Griffin, we're completely left without a remedy, and an injustice would result. Well, I mean, is that our function is to keep an injustice from occurring, or is our function to apply the law? Your job is to apply the law, and the law says. Sometimes the law can be unjust, unfortunately. That's absolutely true, Your Honor. But under the circumstances, the entire endeavor of this court for this case is to discern what the parties intended with respect to the packaging obligation. Miller, their representative admitted that they knew this was going to Austria. Clarion's representative admitted that they had to package it in a manner sufficient to get to Austria. It didn't get to Austria, sufficiently packaged, as evidenced by the damage that occurred at discharge. That damage was discovered two days after delivery. It was opened and photographs were taken, and it didn't sit around unsecured for 40 days as alleged. Okay. Thank you, Your Honor. Thank you very much. Thank you for your helpful briefs and helpful arguments. We appreciate them. The case will be submitted, and the clerk may adjourn the court.